Thomas M. Burton (USB 00518)(CSB035856)
P.O. Box 1619
Salt Lake City, Utah 84110
(801) 918-1656
thomasburtonlaw@aol.com

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| TYLER WEBER; TRACY SARNO; JANET YELDING; and JANAYE KEARNS<br><br>　　　　Plaintiffs,<br>vs.<br><br>DIAMOND RANCH ACADEMY a Utah Corporation; and DOES I through X, inclusive,<br>　　　　Defendants | Case No. 2:14-cv-00884<br><br>OPPOSITION TO DIAMOND RANCH ACADEMY'S MOTION TO DISMISS |

**INTRODUCTION**

　　Defendants' 12(b)(6) motion identifies a multitude of issues, none of which supports their argument for dismissal. Under the standard of review for F.R.C.P. 12(b)(6) motions, the district court must accept as true all factual allegations in the complaint. *Berkovitz v. United States*, 486 U.S. 531, 540 (1988). The court must also construe the complaint in the light most favorable to the pleader, *Jenkins v. McKeithen*, 395 U.S .411, 421 (1969), and may not dismiss unless it appears "beyond doubt that plaintiff can prove no set of facts in support of his

1

claim [that would entitle him to relief." 2 Moore's Federal Practice §12.34 [1][a] at 12-56 (3rd ed. 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)

A complaint need only conform to the notice pleading requirements of F.R.C.P. Rule 8, *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir 2002); *Swierkiewicz v. Sorema N.A.* 534 U.S. 506 (2002) , 5A Wright & Miller, Federal Practice and Procedure, § 1202 at page 68-76 (2d ed. 1990); *Conley v. Gibson* , 355 U.S. 41, 47 (1957) ("[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim.").

Plaintiff's Complaint (hereinafter the Complaint) satisfies F.R.C.P. Rule 8(a), as it contains "direct allegations on every material point necessary to sustain a recovery on any legal theory...or allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." 5A Wright& Miller, Federal Practice and Procedure, § 1216 (2d ed. 1990).

Diamond Ranch Academy (DNA) claims that this Court lacks subject matter jurisdiction because it is a health care provider subject to prosecution only under the aegis of the Utah Health Care Malpractice Ace that invokes a shorter statute of limitations and a cap on recoverable damages .  DRA supports its motion by a mere Utah Department of Human Services residential treatment center license.

DRA does not support its motion by a license from the Utah Department of Health  because it cannot.  It has no Health Care License.  In the absence of a Utah Department of Health Care license, its motion to dismiss is wholly

2

premature. This Court, and these plaintiffs are not required to accept as true its word that it is a health care provider supported only by a Department of Human Services license.

First of all, DRA bears no indicia of a health care provider. By name it does not even purport to be a health care provider, but advertises that it is either or both a ranch or an academy. A ranch grows livestock or grain to feed livestock. An academy teaches classes. Both may have a few nurses and health care people aboard just as does any public school.

Secondly, What does DRA purport to treat? Its web site does not make that clear any more than any private school or Outward Bound program. Most have courses and athletic experience and teach something, but that does not make them health care providers that would require an injured party to resort to the Utah Health Care Medical Malpractice statute.

Thirdly, DRA's credentials are minimal when compared to a real mental hospital. DRA would be hard pressed to prove that admittance requires referral by practicing physicians, psychologists, psychiatrists, or nurses. Most, if not all, its business comes from the parents or caretakers of truant kids. They send them to DRA for reformation, not health care. It is a glorified reform school. There is no screening. All truants are thrown together in three age groups regardless of criminal records, addictions, sexual experience, or prior incarcerations.

Fourth, DRA's main purpose is to make money, not treat juveniles. Its tuition compares with high-level preparatory schools or private colleges. DRA in no way can justify its tuition by any level of care provided or the credentials of its

3

staff.

Fifth, DRA is isolated and secretive. No visitor is admitted who is not on the student's visitor list, which is usually restricted to the enrolling parent or parents. Communication in and out is restricted and closely monitored. The identity of anyone there enrolled is denied. There is no patient bill of rights. There are no cameras recording what goes on. In short, there is no transparency, as there would be in any legitimate health care provider. Legitimate mental health care providers have no restrictions similar to those of DRA, and the <u>care</u> is closely monitored, as opposed to the <u>patient</u>, not only on the inside, but on the outside so that a patient is kept no longer than absolutely necessary, which necessity is evaluated at routine intervals. At DRA, a youth might spend his or her entire minority there so long as the money is available. If it runs out, the student is suddenly no longer in need of DRA services. The length of stay, therefore, depends on the money available, not on any clinical progress made.

Lastly, the Complaint does not address health care, but False Imprisonment, Personal injury, Child Abuse and Neglect, Fraudulent Misrepresentation, and Actual and Constructive Fraud. DRA does not provide health care, so no claim addresses health care.

What it does is lock minors up without due process, keep them isolated for as long as their minority, deprive them of their freedom, of their lives, education, health, safety, and welfare, and leave them with a Stockholm syndrome or Post Traumatic Stress Disorder. Thus, even were DRA a true health care provider instead of a counterfeit one, Plaintiffs' allegations against it are not for negligent

health care, but for unprofessional and tortious wrongdoing having nothing to do with health care.  No medical expert witness is needed to support the allegations of this complaint, so that this Court has subject matter jurisdiction over all that is plead against DRA.

More evidence is needed before this Court can strike its subject matter jurisdiction over DRA as to the charges made against it.  The Utah Health Care Malpractice Act demands a shorter statute of limitations and a cap upon the amount recoverable.  Those advantages to DRA cannot be rendered on the basis of a Human Services License without further factual inquiry after discovery.

## ARGUMENT

1. **THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ALL TORT CLAIMS PLEAD BECAUSE EVEN WERE DRA A BONA FIDE HEALTH CARE PROVIDER, THE NON PROFESSIONAL TORT CLAIMS AGAINST IT DO NOT RELATE TO HEALTH CARE**

Medicine, defined as the science or practice of the diagnosis, treatment, and prevention of disease is not practiced at DRA.  Nothing Plaintiffs alleged requires expert medical testimony in order to hold DRA liable according to the allegations against it.  The allegations against DRA, if proved, make it liable on the basis of res ipsa loquitur.

Additionally, even were this case a real medical malpractice case, DRA's abusive behavior is within the common knowledge exception, and requires no expert witness testimony to establish the allegations made, *Dalley v. Utah Valley Reg'l Med. Ctr.*, 791 P.2d 193, 195-196 (Utah 1990); *Bowman v. Kalm*, 179 P.3d 754 (Utah, 2008).

5

There is ample authority to support the conclusion that a case where a nurse drops a patient fits into this exception. See, e.g., *Massey v. Mercy Med. Ctr. Redding*, 103 Cal. Rptr. 3d 209, 215 (Ct. App. 2009) (holding that, where post-operative patient fell while under nurse's supervision, expert testimony on standard of care was not required since "common knowledge and experience can be used to determine whether the patient fell because she . . . was insufficiently attended to by medical personnel"); *Davis v. Montgomery Cnty. Mem'l Hosp.*, No. 05-0865, 2006 WL 1896217, at *1, *4 (Iowa Ct. App. July 12, 2006) (rejecting hospital's claim that "the process of transferring a skilled-care patient from a bed to the bathroom required expert testimony on the standard of care involved" because it involved "nonmedical and routine" procedure within common knowledge of jurors); *Dimora v. Cleveland Clinic Found.*, 683 N.E.2d 1175, 1180 (Ohio Ct. App. 1996) (holding that patient who fell while being assisted by a nurse fit within "common-knowledge exception" and patient was not required to produce expert testimony to establish professional standard of care); *McGraw v. St. Joseph's Hosp.*, 488 S.E.2d 389, 395-96 (W. Va. 1997) (holding that a patient who fell while nurses were attempting to assist him back to bed raised issue involving "routine hospital care" that did not require expert medical evidence to establish a standard of care); *Cramer v. Theda Clark Mem'l Hosp.*, 172 N.W.2d 427, 428-29 (Wis. 1969) (holding that patient's fall involved "custodial or routine hospital care" that was not so "complex or technical" as to require expert testimony on the standard of care). A hospital patient whose call-light went unanswered fell while trying to go to the bathroom on her own was not a medical

6

malpractice case, *Newhall v. Cent. Vt. Hosp., Inc.*, 133 Vt. 572, 573-74, 349 A.2d 890, 892 (1975).

DRA cites *Platts v. Parents Helping Parents*, 947 P.2d 658 (Utah 1997). *Platts* requires the alleged health care provider to prove that it renders the same or similar care and services as those providers <u>expressly enumerated</u> in the Medical Malpractice Act statute.  In *Platts*, the Utah Supreme Court remanded the case to make that finding.  This would be another question of material fact that prevents dismissal of the complaint at this preliminary stage.  Here, however, it is clear that DRA cannot come close to rendering the same or similar care and services as does an <u>enumerated</u> psychiatric hospital under the Health Care Malpractice Act addressing the same mental health problems that Diamond Ranch Academy purports to treat.[1]

DRA relies upon a Human Services License to justify its inclusion in the Malpractice Act.  In *Platts,*, the Utah Supreme Court, in reversing the Court of Appeals decision, remarked: "The Court of Appeals reversed the trial court and, in doing so, placed undue importance on titles…..However, the statute does not address the similarity of *titles*, but rather the similarity of *care and services*."  DRA does not render services similar to an <u>enumerated</u> psychiatric hospital (meaning enumerated in the Act), because the human services code requires of a residential treatment center no <u>standards of treatment</u> or the preservation of

---

[1] No "Residential Treatment Center" is enumerated in the Utah Health Care Malpractice Act, but such a facility is licensed under the Utah Human Services Code at R.501-19.

patient rights as does the hospital code.[2]  Furthermore, The Utah case of *Tools v.*

---

[2] <u>R432-101-15. Patients' Rights.</u>

    (1) Each patient shall be provided care and treatment in accordance with the standards and ethics accepted under Title 58 for licensed, registered or certified health care practitioners.

    (2) There shall be a committee appointed by the administrator that consists of members of the facility staff, patients or family members, as appropriate, other qualified persons <u>with knowledge of the treatment of mental illness, and at least one person who has no ownership or vested interest in the facility</u>. This committee shall:

    (a) review, monitor and make recommendations concerning <u>individual treatment programs established to manage inappropriate behavior, and other programs that, in the opinion of the committee, involve risks to patient safety or restrictions of a patient's rights, or both</u>;

    (b) review, monitor and make recommendations concerning facility practices and policies as they relate to drug usage, <u>restraints, seclusion and time out procedures, applications of painful or noxious stimuli, control of inappropriate behavior, protection of patient rights</u> and any other area that the committee believes need to be addressed;

    (c) keep minutes of all meetings and communicate the findings to the administrator for appropriate action;

    (d) <u>designate a person to act as a patient advocate, to be available to respond to questions and requests for assistance from the patients and to bring to the attention of the committee any issues or items of interest that concern the rights of the patients or their care and status</u>;

    (e) recommend <u>written policies with regard to patient rights which are consistent with state law. Once adopted, these policies shall be posted in areas accessible to patients, and made available upon request to the patient, family, next of kin or the public.</u>

    (3) The individual treatment plan and clinical orders shall address the following rights to ensure patients are permitted communication with family, friends and others. Restrictions to these rights shall be reviewed by the Patient Rights or Ethics Committee. Limitations to the rights identified in R432-101-15(3)(a) through (d) may be established to protect the patient, other patients or staff or where prohibited by law.

    (a) Each patient shall be permitted to <u>send and receive unopened mail.</u>

    (b) <u>Each patient shall be afforded reasonable access to a telephone to make and receive unmonitored telephone calls</u>.

    (c) <u>Each patient shall be permitted to receive authorized visitors and to speak with them in private.</u>

    (d) Each patient shall be permitted to attend and participate in social, community and religious groups.

*Red Rock Canyon School*, cited by DRA as cogent, is not persuasive for the point

> (e) Each patient shall be afforded the opportunity to voice grievances and recommend changes in policies and services to hospital staff and outside representatives of personal choice, free from restraint, interference, coercion, discrimination, or reprisal.
>
> (f) Each patient shall be permitted to communicate via sealed mail with the Utah Department of Human Services, the Utah Department of Health, the Legal Center for the People with Disabilities, legal counsel and the courts. The patient shall be permitted to communicate with and to visit with legal counsel or clergy of choice or both.
>
> (4) Each patient shall be afforded the opportunity to participate in the planning of his care and treatment. The patient's participation in the treatment planning shall be documented in the medical record.
>
> (a) Each patient shall receive an explanation of treatment goals, methods, therapies, alternatives and associated costs.
>
> (b) Each patient shall be able to refuse care and treatment, as permitted by law, including experimental research and any treatment that may result in irreversible conditions.
>
> (c) Each patient shall be informed of his medical condition, upon request, unless medically contraindicated. If contraindicated, the circumstances must be documented in the patient record.
>
> (d) Each patient shall be free from mental and physical abuse and free from chemical and physical restraints except as part of the authorized treatment program, or when necessary to protect the patient from injury to himself or to others.
>
> (5) Each patient shall be afforded the opportunity to exercise all civil rights, including voting, unless the patient has been adjudicated incompetent and not restored to legal capacity.
>
> (a) Patients shall not be required to perform services for the hospital that are not included for therapeutic purposes in the plans of care.
>  (b) Patients shall not be required to participate in publicity events, fund raising activities, movies or anything that would exploit the patients.
>
> (c) Each patient shall be permitted to exercise religious beliefs and participate in religious worship services without being coerced or forced into engaging in any religious activity.
>
> (d) Each patient shall be permitted to retain and use personal clothing and possessions as space permits, unless doing so would infringe upon rights of other patients or interfere with treatment.
>
> (e) Each patient shall be permitted to manage personal financial affairs, or to be given at least a monthly accounting of financial transactions made on their behalf should the hospital accept a patient's written delegation of this responsibility.

that the Medical Practice Act governs the subject action.  The federal court there was interpreting a Utah statute.  It did not discuss the point that Red Rock, just as DRA, marketed itself as a school with students, not a residential treatment center treating patients, and should be estopped to raise the medical practice act in defense.  In that case, the plaintiff alleged actionable medical failures, not nonmedical torts as Plaintiffs in this case have done.  Furthermore, in that case, the Court admitted that whether Red Rock Canyon School was a "health care provider" was a factual issue, but the plaintiff did not present any facts.  The Plaintiffs in this case want the opportunity to produce evidence pursuant to their discovery rights to show that DRA does not qualify as a Health Care Provider governed by the Utah Health Care Malpractice Act.

Plaintiffs' main complaint is that there are no patient rights or protections in the clandestine DRA facility.  There, DRA does whatever it wants without transparency or accountability, a freedom completely foreign to health care practice.

**PLAINTIFFS HAVE ADEQUATELY STATED CAUSES OF ACTION UPON WHICH RELIEF MAY BE GRANTED**

Defendants' charge of nonspecific pleading cannot be taken seriously, given the notice pleading requirements of the Federal Rules of Civil Procedure. Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions.  Thus, complaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a).  Other provisions of the Federal Rules of

Civil Procedure are inextricably linked to Rule 8(a)'s simplified notice pleading standard. Rule 8(e)(1) states that [n]o technical forms of pleading or motions are required, and Rule 8(f) provides that [a]ll pleadings shall be so construed as to do substantial justice.

Given the Federal Rules simplified standard for pleading, [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding.

Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel maybe decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits", *Swierkiewicz v. Sorema N.A.* 534 U.S. 506 (2002);

Some misguided federal courts, however, have seized upon and misinterpreted *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), as imposing new rules or pleading standards overruling the Federal Rules of Civil Procedure. But. *Iqbal* did not create new pleading standards; it confirmed the pleading standards of Rule 8 that the Supreme Court had already articulated in" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). In both *Twombly* and *Iqbal*, the Supreme Court

11

could not have been more emphatic that it was "not impos[ing] a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556; *Iqbal*, 129 S.Ct. at 1949 (pleading standard is "not akin to a 'probability requirement'") (quoting *Twombly*, 550 U.S. at 556).

Rather, the Court imposed a "'plausibility standard,'" which asks only "for more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). Thus the plausibility standard "simply calls for enough facts to raise a reasonable expectation that <u>discovery</u> will reveal evidence of illegal" conduct. *Twombly*, 550 U.S. at 556. (emphasis added)

In *Twombly* and *Iqbal*, the Court explained that, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557); *Twombly*, 550 U.S. at 561. Under this standard, the allegations must "'nudge [the] claims' … 'across the line from conceivable to plausible.'" *Id*. at 1951 (quoting *Twombly*, 550 U.S. at 570); *see also id*. at 1950 (claim fails "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct").

Defendants ignore the narrow focus of the decision in *Iqbal*. The plaintiffs tried to impose liability for alleged constitutional violations by low-level jail officers not merely on their lieutenants and other supervisors, but on the Attorney General of the United States and the Director of the FBI. Accordingly, the Questions Presented, on which the Court granted certiorari, asked whether the allegations in Iqbal's complaint were sufficient to plead a claim against "a

12

cabinet-level officer." 129 S. Ct. at 1955-56 (Souter, J., dissenting). What the Supreme Court reviewed, and what it rejected, was the plaintiff's extraordinary leap from alleged abuse by a jailhouse employee to vicarious liability for the Attorney General of the United States and the FBI Director. The Supreme Court took pains in *Iqbal* to limit its review of the pleadings solely to the allegations against the FBI Director and the Attorney General, who were "charged with responding to 'a national and international security emergency unprecedented in the history of the American Republic.'" 129 S. Ct. at 1942-43, 1945. The Court went out of its way to note "that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us"

Defendants object to allegations in the Complaint as "conclusory." They apply this epithet to any declarative sentence whose substance they do not like. But a motion to dismiss requires analysis, not mere name-calling. The facts Plaintiffs have plead are entitled to a presumption of truth because they plead facially plausible claims. *Id.* at 1949.

Furthermore, the specificity requirement is always relaxed when the facts Defendant claims it is entitled to are within its exclusive knowledge because it is a clandestine operation without transparency.

In the landmark case of *Committee On Children's Television, Inc. v. General Foods Corporation*, 35 Cal. 3d 197; 673 P.2d 660; 1983 Cal. LEXIS 266; 197 Cal. Rptr. 783, the Court, in denying Defendant's demurrer, stated: [9] "The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge.", and with respect to the fraud

13

allegation, stated: [13] "We observe, however, certain exceptions which mitigate the rigor of the rule requiring specific pleading of fraud. Less specificity is required when "it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy,"

Plaintiffs have stated facts, not pleading formulas.  DRA cannot deny that it is a locked down facility with no visitation or communication with the outside world; with no limitation other than majority on the term of incarceration; with no hearing or other due process procedure available by which to object to being locked up; no transparency by way of cameras or open visitation to evaluate its enforcement activities or strategies to inculcate obedience into the students; with no grievance procedure by which to contact the police or an attorney, as are available to a patient at a true health care provider.  It is obvious on the face of it that DRA does business as a "ranch" or an "academy" or both, not an adolescent mental hospital, or residential treatment center.  Its entire marketing plan is blatantly deceptive of its true nature.  Plaintiffs, accordingly, have met the standard of plausibility and specificity in their pleadings.

## CONCLUSION

Defendant's Motion to dismiss, it is respectfully urged, should be itself denied on all grounds raised subject to the discovery to which the Plaintiffs are entitled under the Federal Rules of Civil Procedure.

 Dated:  March 8, 2015

14

15

_____/s/_____

Thomas M. Burton

15